**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ADRIENNE CECHURA and KENNETH CECHURA    ) | ) 3:09-md-02100-DRH-PMF |
| Plaintiffs,    ) | ) MDL No. 2100 |
| v.    ) | ) Judge David R. Herndon |
| BAYER SCHERING PHARMA AG    ) | ) AMENDED COMPLAINT AND JURY DEMAND |
| AND    ) | ) Civil Action No: 3:10-cv-20055-DRH-PMF |
| BAYER HEALTHCARE PHARMACEUTICALS, INC.    ) Defendants.    ) | |

A COMPLAINT AMENDED pursuant to Case Management Order No. 17. Paragraphs 5, 6, 7, 8, 18, 22, 29, and 33 have been changed from the previous complaint. Paragraphs 9, 10, 11, 12, 14, 15, 17, 19, 20, and 21 have been deleted from the previous complaint.

COMES NOW, Plaintiff Adrienne Cechura, by and through her undersigned counsel, brings this action for damages against Defendants, and states as follows:

**NATURE OF THE ACTION**

1. This is an action brought because Defendants developed, designed, licensed, manufactured, distributed, sold, and/or marketed the pharmaceutical drug Ocella (the generic version of Yaz), an oral contraceptive.

2. As a result of the ingestion of Ocella, Plaintiff Adrienne Cechura has suffered injuries to her person including, but not limited to, a stroke.

**THE PARTIES**

3.      Plaintiff Adrienne Cechura, (herein "Plaintiff"), resides in Cedar Rapids, Linn County, Iowa.

4.      Plaintiff is married to Plaintiff Kenneth Cechura, who also resides in Cedar Rapids, Linn County, Iowa.

5.      Defendant Bayer Schering Pharma AG is, and at all times relevant was, a foreign corporation with its headquarters and principal place of business at Müllerstrasse 178, D- 13353 Berlin, Germany.

6.      At all times relevant, Defendant Bayer Schering Pharma AG was engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, including in the State of Iowa, either directly or indirectly through third parties, subsidiaries or related entities, the oral contraceptive, Yasmin, YAZ, and Ocella.

7.      Defendant Bayer Healthcare Pharmaceuticals INC., is and at times relevant was, a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 340 Changebridge Road, P.O. Box 1000, Montville, New Jersey 07045-1000.

8.      At all times relevant, Defendant Bayer Healthcare Pharmaceuticals Inc. was engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, including in the State of Iowa, either directly or indirectly through third parties, subsidiaries or related entities, the oral contraceptive, Yasmin, YAZ, and Ocella.

16. Defendant Bayer Healthcare Pharmaceuticals INC. applied for and received U.S. marketing approval of Yasmin and YAZ by the FDA, and is the holder of approved New Drug Application ("NDA") for Yasmin and YAZ.

18. Berlex Laboratories, Inc. and Berlex, Inc. were integrated into Bayer HealthCare AG and operate as an integrated specialty pharmaceuticals business under the new name, Defendant Bayer Healthcare Pharmaceuticals, Inc.

22. Defendants Bayer Schering Pharma AG and Bayer Healthcare Pharmaceuticals, Inc. shall be referred to herein individually by name or jointly as "Defendants."

23. At all times alleged herein, Defendants include and included any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind, their predecessors, successors and assigns and their officers, directors, employees, agents, representatives and any and all other persons acting on their behalf.

24. At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessors in interest, aider and abettor, co-conspirator and joint venturer of each of the remaining Defendants herein and was at all times operating and acting with the purpose and scope of said agency, service, employment, partnership, conspiracy and joint venture.

## JURISDICTION AND VENUE

25. This Court has jurisdiction over this action pursuant to 28 U.S.C.A. § 1332, as there is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

26. Venue is proper in the Northern District of Iowa pursuant to 28 U.S.C.A. § 1391, as a substantial part of the events giving rise to these claims occurred within this district, including the prescription and use of YAZ, as well as Plaintiff's resulting injuries.

27. The Court has personal jurisdiction over Defendants consistent with the Iowa and United States Constitution because Defendants caused tortious injury in Iowa by an act or omission outside Iowa by virtue of Defendants' regularly conducted business in Iowa from which they respectively derive substantial revenue. Defendants do substantial business in the State of Iowa and within the Northern District of Iowa, advertise in this district, and receive substantial compensation and profits from sales of Yasmin, YAZ and Ocella within this District.

28. Defendants expected or should have expected that their business activities could or would have consequences within the State of Iowa, as well as throughout the United States.

## FACTS

### Yasmin, YAZ, and Ocella Background

29. Yasmin, (a predecessor to YAZ), known generically as drospirenone and ethinyl estradiol, is a combination birth control pill originally developed by BERLEX LABORATORIES, INC. and/or BERLEX, INC, n/k/a Defendant Bayer Healthcare Pharmaceuticals, Inc. containing the hormones estrogen and progestin.

30. The estrogen is ethinyl estradiol and the progestin is drospirenone, (3 mg ofdrospirenone and 0.03 mg of ethinyl estradiol per tablet).

31. Combination birth control pills are referred to as combined hormonal oral contraceptives.

32. Yasmin was approved by the FDA in April, 2001.

33. In 2006, Bayer acquired BERLEX LABORATORIES, INC. and/or BERLEX, INC, n/k/a Defendant Bayer Healthcare Pharmaceuticals, Inc.and began marketing an almost identical drug, YAZ (which contains 3 mg of drospirenone and 0.02 mg of ethinyl estradiol per tablet).

34. The difference between YAZ/Yasmin and other birth control pills on the market is that drospirenone has never before been marketed in the United States and is unlike other progestins available in the United States.

35. Shortly after the introduction of combined oral contraceptives in the 1960s, doctors and researchers found that women using birth control pills had a higher risk of blood clots, heart attacks and strokes than women not using the pill. As a result, the various brands of birth control pills were reformulated to reduce the amounts of estrogen. As the amounts of estrogen levels reduced, so too did the risk of blood clots, heart attacks and strokes.

36. During this time, new progestins were being developed, which became known as "second generation" progestins (e.g. lovenorgestrel). These second generation progestins, when combined with the lower amounts of the estrogen, ethinyl estradiol, helped to reduce the risk of blood clots, heart attacks and strokes and were considered safer for women.

37. During the 1990s, new "third generation" progestins were developed. Unfortunately, these "third generation" progestins (e.g. gestodene and desogestrel) have been associated with a greater risk of blood clots in the deep veins (deep vein thrombosis or "DVT") and lungs (pulmonary embolism or "PE") and strokes. As a result of this increased risk of blood clots, the FDA has required that products containing third generation progestins include a warning of the potentially increased risk of thrombosis.

38. Yasmin, YAZ, and Ocella contain the same estrogen component, ethinyl estradiol, that has been used in the lower dose birth control pills for decades.

39. However, drospirenone is a new type of progestin and is considered a "fourth generation" progestin. No other birth control pills contain drospirenone, except for a recently approved generic version of Yasmin and YAZ marketed under the trade name, Ocella.

40. Since drospirenone in birth control is new, there are not decades of data available to support its safe use as there are with second generation progestins. Studies that were done prior to FDA approval, however, indicate that drospirenone has certain effects that are different from those of traditional second generation progestins, and potentially more dangerous.

41. One possible mechanism of action is that drospirenone causes an increase in potassium levels in the blood, which can lead to a condition known as hyperkalemia if the potassium levels become too high.

42. Hyperkalemia can cause heart rhythm disturbances, such as extrasystolies, pauses or bradycardia. If left untreated, hyperkalemia can be fatal.

43. If hyperkalemia disrupts the normal heart rhythms, the flow of blood through the heart can be slowed to the point that it permits blood clots to form. Blood clots in the heart can then lead to heart attacks, or the clots can break off and travel to the lungs where they can cause pulmonary embolism, or can travel to the brain causing stroke.

44. Another effect is a substantially increased risk of gallbladder complications.

45. During the brief time that Yasmin and YAZ have been sold in the United States, hundreds of reports of injury and death have been submitted to the FDA in association with Defendants' products.

46. In April 2002, the British Medical Journal reported that the Dutch College of General Practitioners recommended that older second generation birth control pills be prescribed in lieu of Yasmin as a result of 40 cases of venous thrombosis among women taking Yasmin.

47. In February 2003, a paper entitled *Thromboembolism Associated With the New Contraceptive Yasmin* was published in the British Medical Journal detailing a Netherlands Pharmacovigilance Centre report of five additional reports of thromboembolism where Yasmin was suspected as the cause, including two deaths.

48. In fact, in less than a five-year period, from the first quarter of 2004 through the third quarter of 2008, over 50 reports of death among users of Yasmin and YAZ have been filed with the FDA.

49. These reports include deaths associated with cardiac arrhythmia, cardiac arrest, intracardiac thrombus, pulmonary embolism and stroke in women in their child bearing years.

50. Some deaths reported occurred in women as young as 17 years old.

51. Significantly, reports of elevated potassium levels are frequently included among the symptoms of those suffering death while using Yasmin, YAZ, or Ocella.

**Defendants' Over-Promotion, Fraud and Failures**

**Regarding Yasmin, YAZ, and Ocella**

52. Defendants market Yasmin, YAZ, and Ocella as providing the same efficacy as other birth control pills in preventing pregnancy, but with additional benefits.

53. However, because Yasmin, YAZ, and Ocella contain the fourth generation progestin drospirenone, they present additional health risks not associated with other birth control pills.

54. Defendants have been warned at least three times by the FDA; in 2003, 2008 and 2009, for misleading the public through the use of ads which overstate the efficacy of YAZ and/or its predecessor Yasmin, and minimize serious risks associated with the drug.

55. Indeed, the FDA felt Defendants' over-promotion of YAZ was so severe that it required Bayer to run new TV advertisements to correct the previous misleading YAZ advertisements.

56. Bayer ultimately agreed to spend at least $20 million on corrective TV advertisements and to submit all YAZ advertisements to the FDA for advanced screening for the next six years.

57. Defendants ignored the correlation between the use of Yasmin, YAZ, and Ocella and increased thrombosis formation despite the wealth of scientific information available.

58. Upon information and belief, Defendants knew or should have known about the correlation between the use of Yasmin, YAZ, and Ocella and a prothrombotic effect and still promoted, sold, advertised, and marketed the use of Yasmin, YAZ, and Ocella.

59. Defendants falsely and fraudulently represented to the medical and healthcare community, to Plaintiff, the FDA, and the public in general, that Yasmin, YAZ, and Ocella had been tested and was found to be safe and/or effective for its indicated use.

60. These false representations were made by Defendants with the intent of defrauding and deceiving Plaintiff, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, dispense and/or purchase Yasmin, YAZ, and Ocella for use as a contraceptive, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of Plaintiff.

61. Defendants knew and were aware or should have been aware that Yasmin, YAZ, and Ocella had not been sufficiently tested, was defective in its design and testing, and/or lacked adequate and/or sufficient warnings.

62. Defendants knew or should have known that Yasmin, YAZ, and Ocella had a potential to, could, and would cause severe and grievous injury and death to the users of said product, and that it was inherently dangerous in a manner that exceeded any purported, inaccurate and/or down-played warnings.

63. In representations to Plaintiff, her healthcare providers, and/or the FDA, Defendants also fraudulently concealed and intentionally omitted the following material information:

   a. That Yasmin/YAZ/Ocella is not as safe as other available contraceptives;

   b. That the risks of adverse events with Yasmin/YAZ/Ocella (drospirenone and ethinyl estradiol) was higher than those of other available contraceptives;

   c. That the risks of adverse events with Yasmin/YAZ/Ocella was not adequately tested and/or known by Defendants;

   d. Plaintiff was put at risk of experiencing serious and dangerous side effects including, but not limited to, a stroke, as well as other severe and personal injuries, physical pain, and mental anguish;

   e. That patients needed to be monitored more regularly than normal while using Yasmin/YAZ/Ocella; and/or

   f. That Yasmin/YAZ/Ocella was designed, tested, manufactured, marketed, produced, distributed and advertised negligently, defectively, fraudulently and improperly.

64. Defendants were under a duty to disclose to Plaintiff and her physicians, hospitals, healthcare providers and/or the FDA the defective nature of Yasmin, YAZ, and Ocella.

65. Defendants had sole access to material facts concerning the defective nature of the product and its propensity to cause serious and dangerous side effects, and hence, cause damage to person who used Yasmin, YAZ, and Ocella, including Plaintiff.

66. Defendants made the misrepresentations and/or actively concealed information concerning the safety and efficacy of Yasmin, YAZ, and Ocella with the intention and specific desire that the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, would rely on such in selecting Yasmin, YAZ, and Ocella as a contraceptive.

67. Defendants made these misrepresentations and/or actively concealed information concerning the safety and efficacy of Yasmin, YAZ, and Ocella in their labeling, advertising, product inserts, promotional material or other marketing efforts.

68. The misrepresentations of and/or active concealment by Defendants were perpetuated directly and/or indirectly by Defendants, its sales representative, employees, distributors, agents and/or detail persons.

69. Defendants knew that Plaintiff, her healthcare providers, and/or the FDA had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding Yasmin, YAZ, and Ocella, as set forth herein.

70. The misrepresentations of and/or active concealment by Defendants constitute a continuing tort. Indeed, through Defendants' product inserts, Defendants continue to misrepresent the potential risks and serious side effects associated with the use of Yasmin, YAZ, and Ocella.

71. Moreover, Defendants had a post-sale duty to warn the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, about

the potential risks and serious side effects associated with the use of Ocella in a timely manner, yet they failed to provide such warning.

### FACTS REGARDING PLAINTIFF ADRIENNE CECHURA

72. Plaintiff was prescribed Ocella by her health care provider.

73. Plaintiff justifiably relied on and/or was induced by the misrepresentations and/or active concealment of Defendants to purchase and ingest Ocella to her detriment.

74. As a result of using Defendants' product Ocella, April through July 2009, Plaintiff suffered serious and life-threatening side effects including but not limited to, a stroke, as well as other severe and personal injuries, including future thromboembolic events, which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, medical, health, incidental and related expenses, the need for lifelong medical treatment, monitoring and/or medications, and the fear of developing any of the above named health consequences.

75. Plaintiff did not discover, nor did she have any reason to discover that her injury was a result of a defective drug and/or the wrongful conduct of Defendants, as set forth herein, until at least July of 2009.

### CLAIMS FOR RELIEF
### First Claim Against All Defendants
### (Negligence)

76. Defendants introduced their birth control pills described herein into the stream of commerce. At all material times, Defendants had a duty to Plaintiff and other consumers of their birth control drugs to exercise reasonable care in order to properly design, manufacture, produce, test, study, inspect, mix, label, market, advertise, sell, promote, and distribute these products. This includes a duty to warn of side effects, and to warn of the risks, dangers, and adverse events associated with their birth control pills.

77. Defendants knew, or in the exercise of reasonable care should have known, that their birth control pills were of such a nature that they were not properly designed, manufactured, produced, tested, studied, inspected, mixed, labeled, marketed, advertised, sold, promoted, and distributed, and they were likely to cause injury to those who ingested them.

78. Defendants were negligent in the design, manufacture, production, testing, study, inspection, mixture, labeling, marketing, advertising, sales, promotion, and distribution of their birth control pills, and breached duties they owed to Plaintiff. In particular, Defendants:

    a. Failed to use due care in the preparation of their birth control pills to prevent the aforementioned risks to women when the drugs were ingested;

    b. Failed to use due care in the design of their birth control pills to prevent the aforementioned risks to women when the drugs were ingested;

    c. Failed to conduct adequate pre-clinical testing and research to determine the safety of their birth control pills;

    d. Failed to conduct adequate post-marketing surveillance to determine the safety of their birth control pills;

    e. Failed to accompany their products with proper warnings regarding all possible adverse side effects associated with the use of their birth control pills and the comparative severity and duration of such adverse effects;

    f. Failed to use due care in the development of their birth control pills to prevent the aforementioned risks to individuals when the drugs were ingested;

    g. Failed to use due care in the manufacture of their birth control pills to prevent the aforementioned risks to individuals when the drugs were ingested;

      h.      Failed to use due care in the inspection of their birth control pills to prevent the aforementioned risks to individuals when the drugs were ingested;

      i.      Failed to use due care in the labeling of their birth control pills to prevent the aforementioned risks to individuals when the drugs were ingested;

      j.      Failed to use due care in the marketing of their birth control pills to prevent the aforementioned risks to individuals when the drugs were ingested;

      k.      Failed to use due care in the promotion of their birth control pills to prevent the aforementioned risks to individuals when the drugs were ingested;

      l.      Failed to use due care in the selling of their birth control pills to prevent the aforementioned risks to individuals when the drugs were ingested;

      m.      Failed to provide adequate information to healthcare providers for the appropriate use of their birth control pills;

      n.      Failed to adequately warn about the health consequences, risks, and adverse events caused by their birth control pills; and

      o.      Were otherwise careless and negligent.

79.      Defendants knew or should have known that their birth control pills caused unreasonable harm and dangerous side effects that many users would be unable to remedy by any means.  Despite this, Defendants continued to promote and market their hormone therapy drugs for use by consumers, including Plaintiff, when safer and more effective methods of countering the negative health effects of menopause were available.

80.      It was foreseeable to Defendants that consumers, including Plaintiffs, would suffer injury as a result of Defendants' failure to exercise ordinary care as described herein.

81.     As a direct and proximate result of Defendants' conduct, Plaintiffs suffered the injuries and damages specified herein.

## Second Claim Against All Defendants
### (Strict Liability:  Design Defect)

82.     Plaintiffs re-allege all previous paragraphs.

83.     Defendants manufactured, sold, and supplied the birth control pills described herein, and at all material times were in the business of doing so.  They placed these drugs into the stream of commerce.  These drugs were expected to, and did, reach Plaintiff without substantial change in their condition.  Plaintiff ingested these birth control pills.

84.     At the time the birth control pills left the Defendants' hands, these drugs were in a condition not contemplated by Plaintiff, and were unreasonably dangerous to her.  These birth control pills were each dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchased them.  They were more dangerous than Plaintiff contemplated.

85.     The risks of each of these birth control pills outweigh its utility.  There were practicable and feasible safer alternatives to the Defendants' birth control pills.

86.     Defendants' birth control pills are defective and unreasonably dangerous and were a producing cause of the Plaintiffs' injuries and damages specified herein.

## Third Claim Against All Defendants
### (Strict Liability:  Failure to Warn)

87.     Plaintiffs re-allege all previous paragraphs.

88.     Defendants manufactured, sold, and supplied the birth control pills described herein, and at all material times were in the business of doing so.  They placed these drugs into

the stream of commerce. These drugs were expected to, and did, reach Plaintiff without substantial change in their condition. Plaintiff ingested these birth control pills.

89. When Defendants placed their birth control pills into the stream of commerce, they failed to accompany them with adequate warnings. They failed to warn of the true risks and dangers, and of the symptoms, scope and severity of the potential side effects of the birth control pills Plaintiff ingested. These risks, dangers, and side effects include, but are not limited to, strokes, DVT, and pulmonary embolus.

90. Due to the inadequate warnings as alleged herein, at the time the birth control pills left Defendants' hands, these drugs were in a condition not contemplated by Plaintiff, and were unreasonably dangerous to her. They were dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchased them. They were more dangerous than Plaintiff contemplated. Furthermore, their risks outweighed their utility.

91. Defendants' birth control pills described herein are defective and unreasonably dangerous.

92. Had Defendants provided adequate warnings and instructions, Plaintiff would not have ingested these drugs, and would not have suffered the personal injuries she did.

93. Defendants' birth control pills are defective and unreasonably dangerous and were a producing cause of the Plaintiffs' injuries and damages specified herein.

### Fourth Claim Against All Defendants
### Breach of Implied Warranty

94. Plaintiffs re-allege all previous paragraphs.

95. At the time Defendants designed, manufactured, produced, tested, studied, inspected, mixed, labeled, marketed, advertised, sold, promoted, and distributed their birth control pills for use by the Plaintiff, they knew of the use for which their birth control pills were

intended and impliedly warranted their products to be of merchantable quality and safe and fit for their intended use.

96. Contrary to such implied warranty, their birth control pills were not of merchantable quality or safe or fit for their intended use because they were and are unreasonably dangerous and unfit for the ordinary purposes for which they were used, as alleged herein.

97. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered the injuries and damages specified herein.

## Fifth Claim Against All Defendants
### (Gross Negligence/Malice)

98. Plaintiffs re-allege all previous paragraphs.

99. The wrongs done by Defendants were aggravated by the kind of malice, fraud and reckless disregard for the rights of others, the public and Plaintiff for which the law allows the imposition of exemplary damages, in that Defendants' conduct:

   a. Was specifically intended to cause substantial injury to Plaintiff; or

   b. When viewed objectively from Defendants' standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants were actually, subjectively aware of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others; or

   c. Included a material representation that was false, with Defendants knowing that it was false or with reckless disregard as to its truth and as a positive assertion, with the intent that the representation be acted on by Plaintiff. Plaintiff relied on the representation and suffered injury as a proximate result of this reliance.

100. Plaintiffs therefore seek exemplary damages in an amount within the jurisdictional limits of the Court. Plaintiffs also allege that the acts and omissions of named Manufacturing Defendants, whether taken singularly or in combination with others, constitutes gross negligence which proximately caused the injuries to Plaintiff. In that regard, Plaintiffs seek exemplary damages in an amount that would punish Defendants for their conduct and which would deter other manufacturers from engaging in such misconduct in the future.

### Sixth Claim Against All Defendants
(Loss of Consortium)

101. Plaintiffs re-allege all previous paragraphs.

102. Kenneth was, at all times material, married to Adrienne, as husband and wife.

103. The aforesaid conduct of Defendants caused serious personal injuries to Adrienne and was a proximate cause of the damages set forth by Kenneth as set forth below.

104. Due to physical and emotional injuries sustained by Adrienne, Kenneth has endured and will continue to endure the loss of her aid, services, support, society, affection, consortium, and companionship.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek judgment in their favor against the Defendants, jointly and severally, as follows:

    a. Economic and non-economic damages in an amount in excess of $75,000 as to each Defendant as provided by law and to be supported by the evidence at trial;

    b. Reasonable and necessary medical and other health care related expenses in the past and future;

    c. Physical pain and suffering in the past and future;

    d. Physical disfigurement in the past and future;

   e. Physical impairment in the past and future;

   f. Mental anguish in the past;

   g. Mental anguish that in reasonable probability will be suffered in the future;

   h. Exemplary and punitive damages;

   i. Loss of consortium where applicable;

   j. Costs of court;

   k. Attorneys' fees;

   l. Prejudgment and post judgment interest; and

   m. Such other legal and equitable relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff request a trial by jury.


      LARRY HELVEY LAW FIRM


      By:  /s/ Larry D. Helvey
      Larry D. Helvey AT0003424
      2735 First Avenue SE, Ste. 101
      Cedar Rapids, IA 52402
       Telephone:  319-362-0421
      Facsimile: 319-362-3496
      E-mail:  lhelvey@helveylaw.com

      ATTORNEY FOR PLAINTIFF

Original filed.